CAROL ANN ZINN v. PHILIP E. WALKER

No. 8715SC91

(Filed 20 October 1987)

1. **Contracts § 12.4— offer to purchase real estate—resale profits agreement—incorporation into one contract**

    In an action arising from an arrangement whereby plaintiff real estate developer provided money for the purchase of land by plaintiff and defendant real estate agent, a Resale Profits Agreement which required defendant to pay plaintiff 20% of the profit from the resale of his land was enforceable where the Resale Profits Agreement was signed contemporaneously with the Offer to Purchase and became incorporated into that document to comprise the overall contract.

2. **Evidence § 32.2— parol evidence rule—extrinsic evidence—considered despite merger clause**

    An Offer to Purchase real estate, Resale Profits Agreement and Design Agreement were to be construed together, a merger clause in the Offer to Purchase notwithstanding, where the three writings were signed together

within the same transaction and plaintiff told defendant that she would not sign the Offer to Purchase without his signing the Resale Profits and Design Agreements. When the parties' conduct indicates their intent to include collateral agreements or writings despite the existence of the merger clause and the parol evidence is not markedly different, if at all, from the written contract, the parties' intentions should prevail.

**3. Contracts § 19— novation and substitution—no distinction**

North Carolina courts have used the term substitution and novation interchangeably and, although other authorities have drawn distinctions between the two terms, they are held to be one and the same under North Carolina law.

**4. Contracts §§ 18.1, 19— purchase of real estate—contract modified rather than substituted—parol evidence**

In a case arising from the purchase of real estate, the contract between the parties was not substituted but was modified where the parties' intent as construed from their conduct and the circumstances surrounding the 15 July 1983 closing was to carry out the transaction contemplated on 24 May 1983; plaintiff purchased the 36 acres and the option she had bargained for on 24 May; defendant likewise purchased the same tract he had contemplated, with plaintiff producing the front money which deferred his payment obligations; and only the financing terms and the means by which plaintiff and defendant obtained title to the property differed from the original agreement.

**5. Contracts § 19— burden of proof—instruction**

In an action by a real estate developer to enforce a resale profits agreement against a real estate broker, the trial court correctly instructed the jury that the burden of proof for substitution is by clear and convincing evidence.

**6. Process § 19— abuse of process—directed verdict proper**

The trial court properly directed a verdict for defendant on defendant's counterclaim for abuse of process arising from plaintiff's misuse of *lis pendens* in a dispute arising from the sale of real estate where plaintiff held only a contractual interest in the resale profits and there was no real property interest which she could claim. *Lis pendens* may be filed only where a legitimate interest in real property may lie if neither a foreclosure nor attachment order is involved. N.C.G.S. § 1-116(a) (1983).

APPEAL by plaintiff and defendant from *Stephens, Judge.* Judgment entered 14 July 1986 in ORANGE County Superior Court. Heard in the Court of Appeals 1 September 1987.

The evidence at trial showed the following circumstances and events: In mid-April 1983 defendant real estate broker in need of cash for the purchase of land approached plaintiff real estate developer about buying the property (Bennett property) using plaintiff's money primarily to help finance the deal. Plaintiff viewed the property with defendant in April and throughout their discus-

sions understood that defendant wanted plaintiff to put up "front money" which would allow defendant the opportunity to buy the property. Plaintiff subsequently agreed to buy 36 acres of the tract with rights to an option to purchase an additional 36 acres adjacent to what would become plaintiff's property. Plaintiff also told defendant that in view of the enhancement of and increase in defendant's property value which would result from plaintiff's development of her own property, she would agree to the deal only if defendant signed a resale profits agreement. On 24 May 1983 plaintiff and defendant signed three agreements: Resale Profits Agreement, Design Review Agreement, and Offer to Purchase and Contract. Plaintiff indicated to defendant that she would not sign the Offer to Purchase and Contract until the other two agreements were signed. The first of these agreements, the Resale Profits Agreement, and the second, the Design Review Agreement, were as follows:

### Resale Profits Agreement

#### May 24, 1983

We agree to enter into a contractual agreement concerning resale of the Bennett property. The land included in our contract will be the total $+/-$ 86 acres to be purchased July 1, 1983 excluding the $+/-$ 36 acres to be conveyed to Carol Ann Zinn and the $+/-$ 10 acres conveyed to Phil Walker.

The terms of the contract will be to share resale profits 80% to Walker, 20% to Zinn (or designates). Profits are defined as net sales proceeds. Costs of sales to be deducted from gross sales price will include pro-rata shares of outstanding principal, interest (accrued & deferred), survey and legal, commissions and other reasonable expenses associated with sales.

| | |
|---|---|
| s/PHILIP E. WALKER | 5/24/83 |
| (Phil Walker) | (Date) |
| s/CAROL ANN ZINN | 5/24/83 |
| (Carol Ann Zinn) | (Date) |

---

---

Design Review Agreement

May 24, 1983

This document will outline areas of agreement concerning development of the +/− acres being purchased from Harvey Bennett and family by Phil Walker and by Carol Ann Zinn:

Criteria for development will be reviewed by a committee composed of Phil Walker, Carol Ann Zinn, and Bruce Ballantine. The committee will review the compatibility of design, location, and use of the development proposed within the +/− acre tract. Each member will have one vote. All decisions will be made within five working days of written request by a majority of the members. Upon approval of the other two members, a successor to a member may be named. The committee will disband December 31, 1994, and upon a vote of the members may disband at an earlier date.

| s/PHILIP E. WALKER | 5/24/83 |
| (Phil Walker) | (Date) |
| s/CAROL ANN ZINN | 5/24/83 |
| (Carol Ann Zinn) | (Date) |

The third document signed after the above two documents was a standard Offer to Purchase and Contract form approved by the N.C. Bar Association and the N.C. Association of Realtors. Defendant's attorney had deleted several preprinted clauses but had retained the form merger clause. The contract also incorporated by reference plaintiff's option rights agreement regarding the additional 36 acres. The financing requirements, also contained in the contract, provided that plaintiff would make one-half downpayment plus additional cash at closing and annual payments up through 31 December 1987. Until plaintiff completed the annual payments, defendant had no further financial obligations except those required at closing. Since defendant had dealt primarily with the third party sellers (the Bennetts), the Offer to Purchase also stated that it was contingent on the successful consummation of the Bennett sales transaction. Conspicuously absent, however, were the Resale Profits and Design Review Agreements or any references thereto.

Shortly after 24 May 1983, the development of new information necessitated some changes in the transaction's structure. A survey conducted of the Bennett tract showed the property to be 14 acres smaller than was earlier believed. The Bennetts also objected to defendant's method of financing and insisted that the required annual payments be increased to reflect the true value of the financing and price. Ultimately the transaction was closed on 15 July 1983 with both plaintiff and defendant taking title directly from the Bennetts and each paying the Bennetts directly; however, the substance of the initial financing arrangement remained unchanged and plaintiff was to continue making the annual payments as per the 24 May contract.

After the 15 July closing, plaintiff obtained the necessary subdivision permits and began logging and cutting roads on her tract. Later that October, defendant approached plaintiff on several occasions to inform her of potential buyers for his property and the amount of money involved. Each time both plaintiff and defendant agreed that more money could be obtained for the property. Defendant also suggested at one point that fall that he and plaintiff create a limited partnership from which he would receive 40% of the profits and plaintiff 10% or the same ratio stated in the Resale Profits Agreement.

Finally, defendant received an offer from Martin Development Group (Martin) which more than doubled his investment. Again, defendant returned to plaintiff to report the potential profits of the deal and as well the construction design plans from Martin. Plaintiff responded favorably saying she knew their work and would agree to their development. Moreover, plaintiff pointed out that she would be entitled to $100,000 of the $500,000 profit per the Resale Profits Agreement. Defendant responded that he thought she should "think" about the resale profits issue again and that the $100,000 "was a lot of money for her." Plaintiff responded, "There's nothing to think about. We have a contract and I'm entitled to this money." Subsequently, defendant signed an Option Agreement to Purchase Real Estate with Martin in early January 1984.

Learning of the Martin sales contract, plaintiff filed a prior action and a notice of *lis pendens* on defendant's property in March 1984. Defendant, believing that the *lis pendens* would in-

terfere with the Martin deal, negotiated an escrow agreement with plaintiff which would be governed by the outcome of this litigation. Among other terms, the agreement provided for the escrow of twice the amount of money which would be owed plaintiff should the Resale Profits Agreement prove enforceable.

After the agreement's execution, the plaintiff withdrew the prior action and the notice of *lis pendens*. Plaintiff brought this action in April 1985, seeking recovery of her alleged share of the profits from the resale to Martin.

At trial, two issues were put to the jury and were answered as follows:

1. Did the Plaintiff, Carol Ann Zinn, and the Defendant, Philip E. Walker, enter into a contract which included a binding term and condition that Plaintiff would be entitled to receive 20% of the net resale profits from any resale by Defendant of a specified tract of land previously owned by Harvey Bennett and deeded to the Defendant, without regard to whether or not development of Plaintiff's property actually enhanced the resale value of this tract of land?

ANSWER: YES.

2. Did the parties thereafter by words and conduct substitute a new contract for the contract they had originally made, which new contract eliminated any contract term for the Plaintiff to receive 20% of the net resale profits described in issue number 1?

ANSWER: NO.

From judgment entered for plaintiff on the jury's verdict, defendant appeals.

On defendant's counterclaim for abuse of process for plaintiff's improper filing of the *lis pendens*, the trial court directed the verdict and awarded $4,800 to defendant. Plaintiff appeals the directed verdict and also cites as error the failure of the trial court to include in the judgment the foreclosure provision contained in the escrow agreement.

*Faison, Brown, Fletcher & Brough, by O. William Faison and Reginald B. Gillespie, Jr., for plaintiff-appellant/appellee.*

*Bagwell & Associates, by O. Kenneth Bagwell, Jr. and Philip S. Adkins, for defendant-appellant/appellee.*

WELLS, Judge.

## Defendant's Appeal

Defendant brings forward four assignments of error each of which concern the enforceability of the Resale Profits Agreement.

[1] In his first assignment of error defendant contends that the evidence does not support the jury's answer to the first issue regarding the enforceability of the Resale Profits Agreement. Relying on *Housing, Inc. v. Weaver*, 305 N.C. 428, 290 S.E. 2d 642 (1982) and *Boyce v. McMahan*, 285 N.C. 730, 208 S.E. 2d 692 (1974), defendant argues that the Resale Profits Agreement constituted nothing more than an agreement to agree. "A contract to enter into a future contract must specify all its material and essential terms." *Boyce* at 734, 208 S.E. 2d at 695. "If any portion of the proposed terms is not settled, or no mode agreed upon by which they may be settled, then there is no agreement." *Boyce, supra, quoted* in *Weaver, supra,* at 444, 290 S.E. 2d 652. *See also Gregory v. Perdue, Inc.,* 47 N.C. App. 655, 267 S.E. 2d 584 (1980). ["An offer to enter into a contract in the future must, to be binding, specify all of the essential and material terms and leave nothing to be agreed upon as a result of future negotiations." *Id.* at 657, 267 S.E. 2d at 586, *citing Smith v. House of Kenton Corp.,* 23 N.C. App. 439, 209 S.E. 2d 397 (1974).]

The *Weaver* court's analysis both of *Boyce* and its own case noted two common denominators: (1) The original agreements recited that they were preliminary agreements subject to final resolution by later agreements and (2) the agreements specified only the parties' *intentions* not their actual agreement.

In the present case, if the Resale Profits Agreement were the only writing or agreement in evidence, we might agree with the defendant's argument. The terms of the agreement itself suggest that it was an agreement to agree in the future: "We agree to enter into a contractual agreement concerning resale of the

Bennett property . . . ." However, while we might find, on the basis of the evidence presented, that the Resale Profits Agreement, taken alone, is an agreement to agree and not an enforceable contract, we do not believe this to be determinative. Instead, we believe the controlling contract to be the Offer to Purchase and Contract. We hold that the Resale Profits Agreement, being contemporaneously signed with the Offer to Purchase, became incorporated into the same to comprise the overall contract. We overrule the defendant's first assignment of error.

Contemporaneously signed writings may be incorporated together to divine the meaning and purpose of the contractual whole. *Yates v. Brown*, 275 N.C. 634, 170 S.E. 2d 477 (1969). Moreover, the parties' intentions which are controlling in contract construction, *Cordaro v. Singleton*, 31 N.C. App. 476, 229 S.E. 2d 707 (1976), may be construed from the terms of the writings and the parties' conduct. *Heater v. Heater*, 53 N.C. App. 101, 280 S.E. 2d 19 (1981). The defendant, by his own testimony, admits that he and plaintiff had discussed the resale profits before 24 May 1983. In fact, defendant sent a letter to his attorney, dated May 23, 1983, which specified the terms of what became the resale agreement. Additionally, that the Resale Profits Agreement was signed in conjunction with the Offer to Purchase Agreement, indicates the parties' intention to include the Resale Profits Agreement in the overall contract. *Yates, supra.*

Furthermore, the parties' own conduct and words the following fall (1983) indicates even more clearly that both believed the Resale Profits and the Design Review Agreements to be in force and effect. The record shows that defendant sought plaintiff's approval several times that fall regarding potential buyers and a design scheme created by Martin. Defendant also suggested that he and plaintiff form a limited partnership in which plaintiff would receive 10% of the profits while defendant would receive 40%. These terms matched proportionately those terms set out in the Resale Profit Agreement (80%/20%). Finally, plaintiff and defendant both testified that plaintiff told defendant she would not sign the Offer to Purchase Contract until both the Resale Profits Agreement and Design Review Agreement were signed.

The foregoing facts adduced at trial overwhelmingly support the conclusion that the parties intended the incorporation of the Resale Profits Agreement into this resulting contract.

[2] The defendant argues that the merger clause contained in the preprinted Offer to Purchase Contract excludes, as a matter of law, all other agreements not expressed in the Offer to Purchase Contract. We disagree. The merger clauses were designed to effectuate the policies of the Parol Evidence Rule; i.e., barring the admission of prior and contemporaneous negotiations on terms inconsistent with the terms of the writing. North Carolina recognizes the validity of merger clauses and has consistently upheld them. *Hotel Corporation v. Overman*, 201 N.C. 337, 160 S.E. 289 (1931); *Cable TV, Inc. v. Theatre Supply Co.*, 62 N.C. App. 61, 302 S.E. 2d 458 (1983); *Smith v. Central Soya of Athens, Inc.*, 604 F. Supp. 518 (E.D.N.C. 19  ). Merger clauses create a rebuttable presumption that the writing represents the final agreement between the parties. Generally, in order to effectively rebut the presumption, the claimant must establish the existence of fraud, bad faith, unconscionability, negligent omission or mistake in fact. *Smith, supra* at 526; White & Summers, *Uniform Commercial Code*, § 2-12 (2d ed. 1980).

Nevertheless, this Court has recognized an exception to this general rule. Where giving effect to the merger clause would frustrate and distort the parties' true intentions and understanding regarding the contract, the clause will not be enforced: ". . . to permit the standardized language in the printed forms, . . . to nullify the clearly understood and expressed intent of the contracting parties would lead to a patently unjust and absurd result . . . ." *Loving Co. v. Latham*, 20 N.C. App. 318, 201 S.E. 2d 516 (1974).

The distinction between the application of the two rules lies in the parties' overall intended purposes of the transaction in each case and whether admission of parol evidence will contradict or support those intentions as expressed in the writing(s). In the case of *Neal v. Marrone*, 239 N.C. 73, 79 S.E. 2d 239 (1953) the court noted that defendant had failed to plead fraud or mistake and sought to introduce parol agreements which evidenced an *entirely different contract* from that written. *Neal, supra. See also Cable TV, Inc., supra*, when parol evidence which contradicted the express terms of a written contract as well as the parties' intentions was properly excluded. ("Tar River's problem is simply that they wanted more than they contracted for." 62 N.C. App. at 65, 302 S.E. 2d at 460.)

When, however, as in the present case, the parties' conduct indicates their intentions to include collateral agreements or writings despite the existence of the merger clause and the parol evidence is not markedly different, if at all, from the written contract, the parties' intentions should prevail. *Loving Co., supra.* Moreover, " 'separate contracts relating to the same subject matter and executed simultaneously by the same parties may be construed as one agreement,' " and this is true even where one contract states that there are no other agreements between the parties. 3 *Corbin on Contracts* § 578 (1960 & Supp. 1984) p. 648, *citing Williams v. Mobil Oil Corp.*, 83 A.D. 2d 434, 445 N.Y.S. 2d 172 (1981). *See also, Dynamics Corp. of America v. International Harvester Co.*, 429 F. Supp. 341 (S.D.N.Y. 1977); *Flemington National Bank & Trust Co. v. Domler Leasing Corp.*, 410 N.Y.S. 2d 75, 65 A.D. 2d 29 (1978); 17 Am. Jur. 2d *Contracts*, § 224, p. 668 (1964).

That the three writings were signed together within the same transaction and that plaintiff told defendant she would not sign the Offer to Purchase Agreement without his signing the Resale Profits and Design Agreements supports the conclusion that all three were to be construed together, the merger clause notwithstanding.

Defendant further assigns as error the trial court's denial of defendant's Motion in Limine requesting exclusion of any prior or contemporaneous agreements as violative of the Parol Evidence Rule. Defendant specifically assails the admission of the Resale Profits and Design Review Agreements and other oral testimony regarding the parties' preliminary negotiations. We note at the outset that the two agreements are admissible as separately signed writings which should be construed together to comprise one contract. *Yates v. Brown, supra; Dynamics Corp. of America, supra*; 17 Am. Jur. 2d *Contracts*, § 224, p. 668 (1964). Lastly, defendant contends that allowing plaintiff to testify that her agreement to enter into the Offer to Purchase constituted consideration for the Resale Profits Agreement violated the Parol Evidence Rule. Since we have already decided that the Resale Profits Agreement, construed to have been incorporated into the Offer to Purchase, constitutes an enforceable contract, we have decided this point against defendant.

[3] As his second assignment of error, the defendant contends that the parties' conduct following 24 May 1983 which culminated in the 15 July 1983 closing constituted a novation as a matter of law. Again, the facts and law of this case require a different conclusion.

The most noticeable feature of defendant's argument is defendant's own substitution of the word "novation" for the trial court's term "substitution" as the issue was put to the jury. Defendant's confusion of terms necessitates further analysis of the meaning of substitution and novation under North Carolina law. Our review of North Carolina case law and authorities persuades us that our courts have used the terms substitution and novation interchangeably, rendering them definitionally one and the same. Both substitution and novation require the substitution of a new contract for an old one which is thereby extinguished. *Equipment Co. v. Anders*, 265 N.C. 393, 144 S.E. 2d 252 (1965); *Tomberlin v. Long*, 250 N.C. 640, 109 S.E. 2d 365 (1959); *Walters v. Rogers*, 198 N.C. 210, 151 S.E. 188 (1930). We are aware that other authorities have found distinctions between the two terms; *see* Restatement (Second) of Contracts §§ 277-250 (1981) (and *see* 17 C.J.S. Contracts § 10 (1963)). But for the purpose of consistency under North Carolina law we hold that substitution and novation are one and the same. Nevertheless, defendant fails to persuade us either that the contract was novated or substituted.

[4] Substitution of a contract may be effected only by acts or words wholly inconsistent with the material terms of the old contract. 17 C.J.S. Contracts § 10 (1963); 17A C.J.S. Contracts § 395 (1965). Whether a new contract between the same parties discharges or supersedes a prior agreement depends upon their intention as ascertained from the instrument, the relation of the parties and the surrounding circumstances. *Tomberlin v. Long, supra.*

In the present case, the parties' intention as construed from their conduct and the circumstances surrounding the 15 July 1983 closing was to carry out the transaction contemplated on 24 May 1983. Plaintiff purchased the 36 acres and the option she had bargained for on 24 May. The defendant likewise purchased the same tract he had contemplated, with plaintiff producing the "front money" which deferred his payment obligations until 31

December 1987. Only the financing terms and the means by which plaintiff and defendant obtained title to the Bennett property differed from the original agreement. Moreover, the making of a second contract dealing with the same subject matter does not necessarily abrogate the former contract between the same parties. *Turner v. Turner*, 242 N.C. 533, 89 S.E. 2d 245 (1955). We therefore hold that the contract was not substituted but *modified*. A contract may be modified by parol or subsequent conduct of the parties. *Yamaha Corp. v. Parks*, 72 N.C. App. 625, 325 S.E. 2d 55 (1985); *Son-Shine Grading v. ADC Construction Co.*, 68 N.C. App. 417, 315 S.E. 2d 346 (1984); *Biggers v. Evangelist*, 71 N.C. App. 35, 321 S.E. 2d 524 (1984). (Defendant's argument that the former contract was "abandoned" likewise is not persuasive for the reasons outlined above. *Hayes v. Griffin*, 13 N.C. App. 606, 186 S.E. 2d 649 (1972); *Campbell v. Blount*, 24 N.C. App. 368, 210 S.E. 2d 513 (1975).)

[5] Defendant finally contends that the trial court's instruction on the burden of proof for substitution of contract was error. The trial court instructed the jury that defendant's burden of proof on the issue of substitution was by clear and convincing evidence. Relying on *Equipment Co. v. Anders, supra*, defendant contends that in that case the court set forth the burden of proof for novation—specifically that novation must be proved to the jury's satisfaction—the equivalent of the preponderance of the evidence. Nevertheless, for reasons that follow, we do not believe *Anders* to be dispositive on this point.

North Carolina case law is sparse on the issue of the requisite burden of proof for novation, *Anders* apparently being the only North Carolina case even remotely on point. However, there is authority in other jurisdictions which supports a clear and convincing standard for novation. *Spering v. Sullivan*, 361 F. Supp. 282 (D. Del. 1973); *Dunlop Tire & Rubber Corp. v. Thompson*, 273 F. 2d 396 (8th Cir. 1959). It is also well settled that proof of contract modification must be clear and convincing. *Lambe-Young, Inc. v. Cook*, 70 N.C. App. 588, 320 S.E. 2d 699 (1984); *Tile and Marble Co. v. Construction Co.*, 16 N.C. App. 740, 193 S.E. 2d 338 (1972). It follows that it is only logical that the complete eradication of a contract as by substitution or novation should require a standard of proof at least as high as that required for modification of the same contract. Additionally, it is telling that abandon-

ment of a contract, a point defendant asserts within his novation argument, requires clear and convincing evidence. *Bixler Co. v. Britton*, 192 N.C. 199, 134 S.E. 488 (1926); *Hayes v. Griffin, supra.* If abandonment of a contract which discharges an earlier agreement, as do substitution and novation, requires a clear and convincing burden of proof, novation and substitution should be treated in like fashion. We therefore hold that the trial court correctly instructed the jury that the burden of proof for substitution is by clear and convincing evidence.

### Plaintiff's Appeal

[6]   Plaintiff appeals the directed verdict for the abuse of process claim and the resulting judgment. Plaintiff's argument fails to persuade us because, as a matter of law, defendant was entitled to a directed verdict for plaintiff's misuse of the *lis pendens*. N.C. Gen. Stat. § 1-116(a) (1983) makes clear that if neither a foreclosure nor attachment order are involved, a *lis pendens* may be filed only where a legitimate interest in real property may lie. *See also Pegram v. Tomrich Corp.*, 4 N.C. App. 413, 166 S.E. 2d 849 (1969). Plaintiff argues that she was attempting to impose a constructive trust on the property for her share in the resale profits; however, plaintiff only held a contractual interest in the resale profits. There was *no* real property interest which she could claim. Therefore we affirm the trial court's decision and award of $4,800 against the plaintiff.

Finally, plaintiff contends that the judgment failed to include her rights to the resale profits in the event of foreclosure or other similar contingency. We agree that the judgment should incorporate the terms of the escrow agreement and, in any event, insure plaintiff's rights to 20% of the resale profits in whatever form they take. Therefore, we remand for an amendment to the judgment in accordance with this opinion.

No error; remanded for amendment of judgment.

Judges EAGLES and MARTIN concur.